BASS v. METROPOLITAN WEST SIDE EL. R. CO. et al.

(Circuit Court of Appeals, Seventh Circuit.    April 7, 1897.)

No. 405.

1. EMINENT DOMAIN—TAKING WITHOUT CONDEMNATION—INJUNCTION.
   Injunction is the proper remedy against the appropriation of land by a railroad corporation which has not acquired a right to the proposed use either by purchase or condemnation, although the relief is sought in vindication of a purely legal right.

2. LANDLORD AND TENANT—ASSIGNMENT OF LEASE TO RAILROAD COMPANY.
   The fact that a lessor of real property consents to an assignment of the lease to a railroad corporation does not imply a consent that the latter may put the property to a use not permitted by the original lease.

**3. Same.**

Complainant leased lands to A., by a lease which provided that the tenant should erect a building thereon, and that the lessor should, at the end of the term, either pay for the same or give a new lease. The building was erected, and the lease assigned to the defendant railroad company, which, without proceedings under Const. Ill. art. 2, § 13, Id. art. 11, § 14, or Rev. St. Ill. c. 47, § 2, to condemn the property, cut off a corner of the building, and proposed to run its tracks through the space thus cleared. *Held* that, subject to a reasonable opportunity for condemnation proceedings, defendant might be required to restore the building, and refrain from the proposed use.

**4. Same—Erection of Building by Lessee—Lessor's Title.**

Certain premises were leased, the lessee covenanting to erect a building on the land, and the lessor agreeing to either pay for it at the end of the term or renew the lease, the building at the end of the renewal term to belong to the lessor. *Held*, that the title to the building erected vested at once in the lessor, though subject to all the lessee's rights under the lease.

**5. Same—Rights of Lessee.**

The lessee of a building cannot, by repairing or improving one part thereof, acquire a right to destroy another part.

**6. Same—Waste.**

The wrongful removal, by a lessee, of a portion of a building on the demised premises constitutes waste.

Appeal from the Circuit Court of the United States for the Northern District of Illinois.

This appeal is from a decree dismissing a bill for an injunction against the occupation and use for railroad purposes of real estate in Chicago, between Van Buren and Jackson streets, fronting to the east on Market street, and extending to the Chicago river on the west, described as lot 10 in the subdivision of lots 2, 3, and 4 in block 84, School Section Addition to Chicago. The essential facts, as shown by the bill, answer, and proofs, are these:

In 1888, the appellant, Clara F. Bass, leased the premises to John P. Altgeld for the term of 90 years, at an annual rental of $2,500 for the first 10 years, and thereafter of 5 per centum of the "fair salable value of the leased premises exclusive of the buildings," to be ascertained by appraisement on July 1, 1898, and every succeeding tenth year, but at no time to be less than $2,750 per annum, the tenant paying all taxes, rates, charges, and assessments, and maintaining in good repair buildings and improvements. Of the numerous provisions and covenants in the lease, binding upon or for the benefit of the respective parties, their heirs, representatives, or assigns, those especially pertinent to the present discussion are, in substance, the following: The tenant shall forthwith erect on the premises "a good and substantial building of brick, stone, and such other material as is commonly used on the outside and in the inside of first-class buildings, the foundations and walls to be sufficiently strong to support a building eight stories high, and the building to be at least seven full stories in height above the grade of the street, and to cost not less than the sum of $50,000, according to designs, plans, and specifications, to be approved in writing by the lessor, * * * and in accordance with the building ordinances of the city of Chicago, covering the entire premises aforesaid." The tenant shall keep the building insured for three-fourths of the value, and, in case of destruction or damage by fire, "shall repair the same upon designs, plans, and specifications to be approved by the party of the first part, * * * so that the building shall entirely cover said premises, and shall be at least seven full stories in height above the grade of the street, also of such materials and with such foundations and walls as shall be approved by said party of the first part, * * * to cost not less than $35,000, exclusive of foundations, and have the same rebuilt and ready for occupancy within eighteen months from such loss and destruction"; and, in case of failure to rebuild, all insurance money shall belong to the lessor. In the event of the determination of the lease before the expiration of the term for breach of any covenant herein, the building, fixtures, and improvements on the premises shall be forfeited to

and become the property of the owner of the fee, "without any compensation therefor" to the tenant. At the end of the term of 90 years the owner of the fee shall either purchase the building, fixtures, and improvements on the premises, paying sixty per cent. of their cash value, as determined by an appraisement provided for, or make a new lease for forty years on the terms of the original lease, except that, in lieu of the clause for the purchase of building, it shall be provided that, if the lease expires by lapse of time or otherwise, the building or buildings, with all improvements and fixtures then on the premises, shall become and be the property of the owner of the fee, without rendering any compensation therefor. The tenant shall at no time permit any part of the premises to be occupied adversely to the interest or title of the lessor. No assignment of the lease shall be made without giving the owner of the fee the option to buy the leasehold interest at the price of the proposed assignment. "In order to secure the payment of all rent due, accruing, or to accrue under this lease, and also all sums advanced or paid for taxes, duties, rates, charges, assessments, or impositions as aforesaid, or due upon any other account whatever, and for which said lessor, her heirs, executors, administrators, or assigns, may be entitled to repayment hereunder, she, he, or they shall have at all times a first and valid lien upon all improvements and tenements, and the materials thereof, which may be at any time upon the said leased premises," "meaning and intending hereby to give the party of the first part, her heirs, executors, administrators, and assigns, a valid and first lien upon any and all buildings, improvements, and other property on said premises belonging to the party of the second part, his heirs, executors, administrators, and assigns, as security for the payment of said rent in the manner aforesaid, anything hereinbefore contained to the contrary notwithstanding." A seven-story brick building was accordingly erected, at a cost of more than $50,000, and covering the entire lot except a strip, five or six feet wide, next to the river.

In 1894, the appellee, the Metropolitan Elevated Railroad Company, a corporation organized to operate an elevated railroad in Chicago, acquired the premises adjacent to the appellant's lot on the north, extending from Market street to the river, and, having removed existing buildings, constructed thereon an elevated railroad, upon which its trains run, and for some months prior to the filing of the bill had been running, in their passage to and from the western division of the city. In order to connect its road with the loop elevated railroad in process of construction in the city, the Metropolitan Company found it necessary to cut away the northeast corner of the appellant's building above the first story thereof, and, in order to accomplish that end without resort to proceedings for condemnation under the statute of the state, procured an assignment to itself of the leasehold estate; Altgeld having assigned in 1889 to John J. Mitchell, who on August 29, 1895, assigned to the Metropolitan Company. These assignments were made with the consent of the appellant. Upon coming into possession, and before the filing of the bill, the Metropolitan Company proceeded to cut away the northeast corner of the building above the first story, the portion removed being in the form of a prism, with three plane faces extending from the top of the building, the lines of section of the walls being 13.4 feet on the north and 12.4 feet on the east from the northeast corner of the building. A freight elevator which had been in that corner was removed, and re-erected next to the north wall, at a point halfway from Market street to the river. According to the plans in evidence, no supporting columns have been or will be placed upon the land of the appellant, but the portion of the first story not cut down will be crossed by a girder upon which will rest the track connecting the road of the Metropolitan Company on the north side of the premises with the road of the Union Consolidated Elevated Railroad Company in front of the premises on Market street. The Metropolitan Company is insolvent, and its road is in the hands of a receiver, the respondent and appellee Dickson MacAllister.

The prayer of the bill is that the appellee be enjoined from placing the proposed structure across the premises, and from running trains thereon within the lines of the lot; that the receiver be required to perform the covenants of the lease, to restore the building to the condition in which it was before the cutting off of the corner, and thereafter to maintain the same in accordance

with the terms of the lease; and that, in default thereof, the lease be forfeited, and the premises surrendered to the appellant.

It is shown that the Metropolitan Company paid Mitchell for the leasehold $84,000, and, in addition, expended upon the property, for necessary improvements and repairs, more than $10,000, and that in its present condition the building is a better security for the payment of rent and the performance of other covenants of the lease than it was before the Metropolitan Company took possession. The constitution of Illinois (article 2, § 13) provides "that private property shall not be taken or damaged for public use without just compensation," which, "when not made by the state, shall be ascertained by a jury, as shall be prescribed by law"; and by article 11, § 14, it is provided: "The right of trial by jury shall be inviolate in all trials of claims for compensation, when, in the exercise of the said right of eminent domain, any incorporated company shall be interested either for or against the exercise of said right." Section 2 of an act "to provide for the exercise of the right of eminent domain" (Rev. St. Ill. c. 47) requires the railroad company which proposes to take property to file in court "a petition, setting forth, by reference, his or their authority, in the premises, the purpose for which said property is sought to be taken or damaged, a description of the property, the names of all persons interested therein as owners or otherwise, as appearing of record, if known, or if not known stating that fact, and praying such judge to cause the compensation to be paid to the owner to be assessed. * * * Persons interested, whose names are unknown, may be made parties defendant by the description of the unknown owners." By section 11, "any person not made a party may become such by filing his cross-petition, setting forth that he is the owner or has an interest in the property, and which will be taken or damaged by the proposed work; and the right of such last named petitioner shall thereupon be fully considered and determined." The opinion of the court below is in the record, but has not been reported.

A. W. Green, Henry S. Robbins, and Lockwood Honore, for appellant.

John P. Wilson and W. W. Gurley, for appellees.

Before WOODS and JENKINS, Circuit Judges, and GROSSCUP, District Judge.

WOODS, Circuit Judge, after making the foregoing statement, delivered the opinion of the court.

It is not disputed that injunction is the proper remedy against the appropriation of land for the use of a public corporation which has not acquired a right to the proposed use either by purchase or by condemnation; and, contrary to the general rule that equitable relief is granted only when equitable considerations require it, the injunction in such cases may be, and perhaps more frequently than otherwise is, sought in vindication of a purely legal right; and, if the technical right and a threatened infraction of it be established, the relief will be granted without inquiry into the general equities of the case. By this we do not mean that a specific equity, like an estoppel, may not be a defense to such a suit; but, if a complete defense be not shown, the court will not refuse the relief on grounds of equitable discretion, as it might do in a suit for specific performance or rescission or other cause involving no special constitutional or statutory right of such a nature as to be capable of vindication or enforcement only by injunction. "In cases of this character," said the supreme court of Illinois in Cobb v. Coal Co., 68 Ill. 233, "courts of equity have acted on broader principles [than in ordinary cases], and have adopted as a rule that an injunction will be granted to prevent a railway company from ex-

ceeding the power granted in their charter.   *   *   *   The courts do not require when the effort is manifested by a railway company to wrongfully appropriate private property, or force their structures to places not authorized, that there should be a want of remedy at law." And in Lewis on Eminent Domain (section 632), it is said, in substance, that the jurisdiction of equity in such cases may be placed upon the broad grounds that when the power of eminent domain has been delegated to public officers or others who are threatening to make an appropriation of private property to public uses in excess of the power granted, or without complying with the conditions on which the right to make the appropriation is given, equity will prevent the threatened wrong, "without regard to the question of irreparable damages or the existence of legal remedies which may afford a money compensation." The controlling inquiry in the present case, therefore, is whether the Metropolitan Company, which, it is not denied, has been in rightful possession, has appropriated or is about to appropriate any part of the leased premises to a corporate use which is not justified by the lease.

It is not to be doubted that, by consenting to the transfer of the leasehold to the railroad company, the appellant consented to any use of the property which was permitted to the original lessee; but it is not to be inferred that she thereby consented, as it is contended she did, to the particular use proposed, since there were various other railroad purposes which might have been in contemplation, and which in no sense would have been inconsistent with any condition or covenant of the lease. Of the elaborate and forceful argument made here on the part of the appellees the primary proposition is that "the railroad company, being the owner of the leasehold estate and of the buildings upon the premises in question, and in possession of the same, has the right to devote all or any portion of the premises to railroad purposes without resorting to proceedings under the eminent domain act to acquire the interest of the lessor." As corollary or subordinate propositions, it is asserted that the appellant has not been damaged by the changes made in the building; that the bill of complaint is a bill for specific performance, on which relief need not be granted as a matter of absolute right; that neither the railroad company nor its receiver has violated any covenant of the lease; and that the alterations made in the building and the proposed construction and use of railroad tracks do not constitute waste. In the first of these propositions is the explicit assertion, on which the entire argument mainly depends, that the railroad company owns the building erected upon the leased premises; and the same view finds expression in the opinion of the court below, where, after reference to some of the provisions in the lease, it is said, "In other words, the building now on the premises is subject to a lien for the rents to become due." While it is true that the intention to give the appellant a lien upon the building, as well as "upon all improvements and tenements, and the materials thereof at any time upon said leased premises," and on "other property" of the tenant on the premises, is plainly declared, and it is also stipulated that at the end of the term the owner of the fee shall purchase the building or extend the term of the lease,

it is clear upon the whole instrument that in no event was a removal from the premises of the building, which the lessee undertook to erect and keep in repair, contemplated. On no conceivable contingency can there arise under the contract a right on the part of the lessee to remove the building, even were it a physical possibility to do so. In contemplation of law, the building was intended to be, and accordingly in the process of construction it became, a part of the realty. "The well-settled rule is that such erections as this become a part of the land, as each stone and brick are added to the structure." Kutter v. Smith, 2 Wall. 491; Elwes v. Maw, 3 East, 38; Tifft v. Horton, 53 N. Y. 380; Sanders v. Village of Yonkers, 63 N. Y. 491; Ford v. Cobb, 20 N. Y. 344; Deane v. Hutchinson, 40 N. J. Eq. 83, 2 Atl. 292; Fortman v. Goepper, 14 Ohio St. 558; Sword v. Low, 122 Ill. 487, 13 N. E. 826; Dooley v. Crist, 25 Ill. 453; Corrigan v. City of Chicago, 144 Ill. 537, 33 N. E. 746. See, also, Hawes v. Favor, 161 Ill. 440, 43 N. E. 1076, cited by the appellees. In legal effect, the contract was that the lessee should erect upon the premises for the lessor a building, and maintain it in good repair to the end of the term of the lease, and that, in consideration therefor (the rent, taxes, and other charges meanwhile having been discharged) the lessor should then pay to the lessee the specified percentage of the appraised cash value of the building, or, at her option, extend the term of the lease. Though in form the lessor is bound to purchase the building, the evident intention is simply that, in one or the other mode prescribed, she shall make compensation for the erection of the structure, and for keeping it in repair during the term of the lease. As a covenant running with the land, this is doubtless a charge upon the entire property, including the building, and it is difficult to conceive that the building became subject at once to a lien in favor of the lessee and also in favor of the lessor. Against this construction of the lease, it is urged that the declaration of a lien on the building is made meaningless; but it is to be observed that, without a stipulation therefor, the landlord could have no lien on fixtures or other movable property of the tenant; and, since it is not always easy to determine certainly what is or is not removable as a fixture, it was not necessarily ill advised or unnecessary to include the building in the stipulation for a lien.

The proposition being established that the title to the building, like that to the land, is in the appellant, it results that the rights of the parties in other respects must be determined on that basis; that is to say, by the same rules as if the building in its original form of construction, with its corner intact, had been upon the lot when the lease was executed. The contract required that the structure should cover the entire lot, and should cost not less than a stated sum, but it was always competent for the parties to waive any term of the agreement; and when, with the consent of the lessor, and by choice of the lessee, a building was constructed at a larger cost than was stipulated, and upon foundations which did not include a part of the lot next to the river, the rights and obligations of the parties became the same as if the actual construction and cost had been specifically required by the lease. And so, if, by the original construction, the northeast corner had been of the shape caused by cutting away the stories above the

first, that, being assented to, would have become the structure of the contract; and the question before us would have been, as suggested in the opinion below, whether, without the consent of the appellant, the railroad company, by virtue of its rights as assignee of the leasehold estate, could lay its girder and track and run its cars as it proposes to do. The repairs made on the building by the railroad company, after it took possession, were for the most part necessary, and therefore came within the covenant to repair; but if they had been entirely voluntary, and if other improvements were made, whereby the premises have an increased value, the building, nevertheless, remained the property of the appellant. The railroad company did not, by repairing or improving one part, acquire a right to destroy another part; and it is not material to the question of relief by injunction that the floor space of the part removed is small and insignificant in comparison with the space that remains. With all repairs and improvements, the building, as it stood at the instant when the cutting away of the corner was commenced, belonged to the appellant. The title to the space taken and the reversionary right to the use of it were hers, and, as we conclude, it was not the privilege of the railroad company, without her consent, to remove any part of the structure in order to occupy the space with its tracks, the right to do so not having been acquired by condemnation.

The removal of the corner, for whatever purpose done, it seems clear, on the authorities cited, was an act of waste, which before its commission might have been enjoined. Brock v. Dole, 66 Wis. 142, 28 N. W. 334; Phelan v. Boylan, 25 Wis. 679; Hunt v. Browne, Sausse & S. 178; Davenport v. Magoon, 13 Or. 3, 4 Pac. 299; Kidd v. Dennison, 6 Barb. 9; Agate v. Lowenbein, 57 N. Y. 604; Stetson v. Day, 51 Me. 434; Cannon v. Barry, 59 Miss. 289; 6 Wait, Act. & Def. 238, 239; 28 Am. & Eng. Enc. Law, 870. But whether, in any case where the question is solely one of waste already committed, and no appropriation of property to corporate use is intended, the court would interfere to compel reconstruction or a repair of the waste is not the present question. If it were, possibly it would be proper to give weight to such equitable considerations as that the appellant's security is not to be impaired, and to other like suggestions which have been urged; but when, as here, waste has been committed by removing a substantial part of a building which was intended to be a permanent structure, for the purpose of making way perpetually or indefinitely for the track of a railroad, the work of removal is not to be considered by itself, but as a step in the execution of a scheme to take property for a corporate use without making compensation, which, as already stated, the court will enjoin, though the right invaded be a purely legal or technical one. Only in that way can the policy of the enactments against the taking of private property for corporate uses without compensation be fully vindicated; and without an order for the restoration of the building to its original form, or, in default thereof, a forfeiture of the lease, the relief would not be adequate or complete.

It is, of course, true, as said below, that the leasehold estate is in the entire lot, and that the tenant has possession of all the space

above it, as well what is not actually filled by the building as what is; but, whatever might be thought of the case if the space in question had been open at the start, the tenant, it is clear, had no right to take down the upper stories of the building in order to create the unfilled space; and therefore, as we conceive, it is not true, as was further stated, that, while the term of the lease continues, nothing is invaded but the interest of the tenant. There has been already a destruction of property which constitutes a taking in violation of the law of eminent domain as distinctly as would the digging out and removal of earth from the corner of the lot; and, besides, the reversionary interest has been directly affected, and will be further affected if the proposed location of the girder and track of the railroad be not forbidden. The demand of the appellant for present relief against the wrong done and intended is not met by the suggestion that, "if the leasehold estate should be extinguished, of course the railroad company would be a trespasser, if it did not remove its girder." The railroad company might abandon possession, leaving to the landlord the expense both of removing the girder and of reconstructing the torn down corner, with recourse for the outlay upon no responsible party; but, more likely, the trespasser would surrender possession, if at all, only at the end of a litigation, to the expenses and contingencies of which the appellant or her successor in interest ought not, by judicial sanction, to be subjected. The proposed occupation of the premises is shown to be necessary in order to overcome engineering difficulties which otherwise are practically insuperable, but, if it were only a matter of convenience, it would be equally evident that the occupation is intended to be, and will be, perpetual, as, doubtless, the public interest will require that it shall be. If, as was stated at the hearing, the charter of the present railroad company is limited to fifty years, that signifies only that from time to time, when necessary, new companies will be organized, to which, in succession, the road and its equipment will be transferred. As against the lessor, such an occupation of her property is wrongful from the beginning. The possessory right is in the lessee, and for that reason, it may be, the railroad company, until the lease shall have ended by lapse of time or by forfeiture, cannot be dealt with as a trespasser; but, that being so, it is the more important that the remedy here invoked should not be denied. If the lease were for a short term, one year or ten, instead of ninety years, it would be evident that the railroad company has exceeded its privileges as tenant, and has invaded, appropriated, and injured present property rights of the landlord and reversionary interests, which, without consent or proceedings to condemn, it had no right to take or injure. The bill, it is plain, is not one for specific performance merely. It is not a valid objection to our conclusion that it may be difficult, or even impossible by any certain rule, to estimate the compensation which, in a proceeding to condemn, should be awarded the appellant. The decree below is reversed, and the cause remanded for further proceedings. In order to obviate destruction or serious injury to property, the court may grant reasonable time for proceedings to condemn.