Oscar F. Mayer, Appellee, v. William M. Collins, Impleaded with Dario L. Toffenetti, Appellant.

Gen. No. 37,649.

440

Opinion filed April 1, 1935.   Rehearing denied April 15, 1935.

ROSENTHAL, HAMILL & WORMSER, of Chicago, for appellant; LESSING ROSENTHAL, F. HOWARD ELDRIDGE and WILLARD L. KING, all of Chicago, of counsel.

MAYER, MEYER, AUSTRIAN & PLATT, of Chicago, for appellee; CARL MEYER, FREDERIC BURNHAM and M. PAUL NOYES, all of Chicago, of counsel.

MR. PRESIDING JUSTICE O'CONNOR delivered the opinion of the court.

Oscar F. Mayer, the lessee of defendant, William M. Collins, under a 99-year lease expiring 1991, filed his bill to enjoin defendant from forfeiting the lease. After answer filed, an interlocutory injunction was issued as prayed for and defendant prosecuted an appeal to this court where, upon consideration, the interlocutory order was affirmed, *Mayer v. Collins,* 263 Ill. App. 219. Afterward the cause was referred to a master who took the evidence, made up his report and recommended that a decree be entered enjoining the defendant. Thereafter the master's report was approved, a decree was entered making the temporary injunction permanent, and defendant appeals.

The record discloses that in 1910 complainant became the owner of a leasehold estate, and at the same time purchased the building on the premises at 57–59 West Randolph street, Chicago. The leasehold estate was for 99 years beginning March 1, 1892, and ending February 28, 1991. In 1921 the defendant, Collins, subleased the building from complainant for a period of 10 years and Collins in turn sublet the premises to a Chinese restaurant company which occupied the premises until about April, 1931. In 1925 defendant, Collins, became the owner of the fee. A short time prior to the expiration of the 10-year sublease to Collins complainant executed a new sublease to Dario, L. Toffenetti. This sublease expired in 1991. The premises were improved by a four-story building which had been built shortly after the Chicago fire in 1871. When the Chinese Restaurant company vacated the premises in 1931 at the expiration of the 10-year sublease, plaintiff took the position that the building was in a very bad and unsafe condition, and by the terms of the sublease Toffenetti was obligated to spend not less than $60,000 in improving, repairing and remodeling the building in order to put it in good condition so that it could be used for restaurant purposes.

About the time the premises were sublet to Toffenetti complainant negotiated with defendant, Collins, with a view to remodeling or replacing the building but they were unable to reach an agreement. Complainant offered to guarantee to defendant, during the building operations, payment of rent, taxes and all other covenants of the lease; that upon completion of the new building it would be fully paid for and free of liens; that such guarantee would be evidenced by a bond executed by a surety company to be approved by defendant, in an amount satisfactory to defendant, or by the deposit with some trust company to be designated by defendant, "cash or marketable securities approved by you for the full amount of the cost of such improvements."

About June 1, 1931, Toffenetti, under his sublease, started to improve the premises by tearing down the building except the side walls, and the building was practically all removed except the side walls on June 17, 1931, and a new building, except such walls, was constructed and completed about November, 1931. Shortly thereafter Toffenetti proceeded to conduct his restaurant business in the building.

The master found that it cost Toffenetti approximately $145,000 to complete the building, and counsel for defendant point out in their brief that the new building actually cost between $185,000 to $189,000. The cost of the building has been paid.

The evidence further shows that on June 2, 1931, the day after Toffenetti began to take down the old building, defendant, Collins, caused a notice to be served on complainant that the tearing down of the building "is a serious and substantial default in the covenants" of the lease to be kept and observed by complainant as lessee, in that complainant covenanted to keep and maintain on the premises after the first of May, 1903, a building worth not less than $35,000, in good repair and condition during the period covered by the lease;

that the erection and removal of the old building constituted waste and that Collins, the lessor, "may exercise . . . the remedy of forfeiture and entry or action thereon"; that if the work were persisted in, Collins, without waiving any of his other rights, would "be at liberty to terminate said lease as in said lease provided, or otherwise proceed as by a law in such case provided." Fifteen days thereafter Collins served another notice on complainant, Mayer, notifying him that on account of the removal and erection of the building he had elected to determine the lease, and further notified Mayer "to quit and deliver up possession of the said lands and premises to me within ten (10) days of this date." Eight days thereafter complainant filed the bill in the case now before us to enjoin defendant from forfeiting the lease.

Complainant offered evidence tending to show that when the Chinese Restaurant company vacated the premises they were left in a bad state of repair and in an unsafe condition, which resulted in a great measure through the fault of the Chinese company or its lessor, Collins; that the most feasible and practical way of putting the premises in proper condition was to remove the building, except the side walls, and construct a new one; and that the construction of such new building was necessary even though the condition of the old building was not the result of any neglect or default on the part of Collins or his subtenant.

On the other side, defendant offered evidence tending to show that the old building was not in an unsafe condition when the Chinese Restaurant company vacated; that it could have been put in good condition by making repairs; that it was not necessary to demolish the old building and construct a new one; and that any repairs that were necessary after the Chinese Restaurant company vacated should have been made by Mayer, as required by the 99-year lease.

Defendant contends that the allegation of the bill to the effect that defendant, Collins, under his sublease was required to keep the building in a good state of repair, was not sustained by the proof; that there is a total lack of proof in this respect; that the word "repair" is scrupulously omitted from Collins' sublease; that it was complainant, Mayer's duty under the terms of his long term lease to keep the premises in good repair and condition; that "Collins' only obligation under his sublease was 'to keep said building in a safe, clean and wholesome condition' and 'conformable to the requirements of the City of Chicago and all public authorities.' " The defendant further contends that complainant failed to prove the allegations of his bill, in that the evidence failed to show that the old building, at the time it was vacated by the Chinese Restaurant company was in a bad state of repair and in an unsafe condition. In support of this contention counsel for defendant discuss in considerable detail the evidence as to the condition of the basement walls, the inadequacy of the floors, the stressing of the joists and other defects.

As to the contention with respect to the condition of the building, we think it sufficient to say that the evidence was conflicting. The master saw and heard the witnesses testify; he found the building was in a very bad state of repair. The decree entered by the chancellor concurred in this finding, and upon a careful consideration of all the evidence we are of opinion that the finding of the master and the chancellor was justified. Certain it is we could not say that such finding is against the manifest weight of the evidence. In these circumstances we would not be warranted in disturbing the decree.

Was it the default of Collins under his sublease, or the default of Mayer under the long term lease, that caused the condition of the building at the time it was vacated by the Chinese Restaurant company? As

stated, defendant, Collins, contends he was not obligated to repair the premises but that the duty devolved upon Mayer to do so under his long term lease; that under the terms of that lease Mayer was obligated "at all times during the continuance of this lease . . . keep and maintain upon said demised premises a building worth not less than Thirty-five Thousand Dollars ($35,000.)" Under his sublease Collins covenanted and agreed that during the period covered by the sublease he would keep the premises free and clear of all liens, claims and charges caused by reason of any act or failure to act on his part; that "during said demised term said demised premises shall at all times be kept and maintained in a safe, clean and wholesome condition and in conformity with the requirements of all health and police regulations of the City of Chicago."

Counsel for complainant say that since the provision just quoted required Collins to keep the premises in a safe, clean and wholesome condition in conformity with the requirements of all health and police regulations of the city, this required Collins to keep the premises in repair during the period of his sublease, although the word "repair" was not specifically used, and that the evidence shows that through Collins' breach of his lease the building was rendered unsafe. Counsel further says that whether Collins was obligated under his lease to keep the premises in repair is wholly immaterial, because the building was, in fact, in a bad state of repair and in an unsafe condition, and therefore it was imperative that the building be repaired or removed and a new building constructed to render the premises safe. We think the evidence sustains this latter contention. This was the finding of the master and the chancellor.

We are further of opinion that since Collins, by his sublease, was obligated to keep the building in a safe condition "conformable to the requirements of the

City'' it was his duty to see that the building was maintained in a safe condition.

Moreover, the contention that complainant failed to prove the allegations of his bill, viz., that Collins was required to repair the premises, seems to have been raised, for the first time, in this court. There was no objection to the master's report in this respect, and the only exception on this point filed before the chancellor was the general exception that the master ''erred in finding that the material allegations in the bill of complaint have been proven.'' The objection and exception should have specifically pointed out the alleged failure of proof to render the contention now made available to Collins.

Complainant takes the position that it was necessary for him to reconstruct the building to render the premises safe and that it was impractical to reconstruct the building piecemeal, that he was advised to this effect by reputable architects and engineers. In reply to this counsel for defendant say that this fact, if it be a fact, is of no significance where, as here, it appears that the tenant, Mayer, under the long term lease, violated his covenant to repair until the building could not be easily repaired, and in these circumstances Mayer did not have the right to demolish the building and erect a new one, ''in the teeth of a covenant 'at all times to keep and maintain a building on the premises.' '' And he further contends that ''the evidence does not sustain the contention that the making of the repairs piecemeal was not practicable,'' and that practically all the witnesses testified that all the defects pointed out in the old building could readily be remedied.

We have considered all the evidence in the record and are of opinion that while the building might have been reconstructed in piecemeal, yet it was clearly inadvisable to do so. The evidence shows the new

building could be and was constructed in a short time—probably a shorter time than the work would have taken done piecemeal. All the evidence is to the effect that it would be much more advisable to construct a new building, as was done.

Under the laws of this State we hold complainant had a right to construct the new building under the circumstances as disclosed by the evidence. *Hawes v. Favor,* 161 Ill. 440; *Northern Trust Co. v. Thompson,* 336 Ill. 137.

In the *Hawes* case the lessee of a long term lease was given an option to purchase the freehold upon compliance with the covenants of the lease. Afterward the lessee filed a bill for specific performance to compel a conveyance of the property, claiming the lessee had complied with all of the terms of the lease. One of the defenses interposed was that the lessee had been guilty of "pulling down and destroying the dwelling house on these lots, without the consent of her lessor." The covenant of the lease was that the dwelling house on the lot should be taken and held as part and parcel of the realty, and shall "in no case be removed therefrom." The price to be paid for the property was $4,000. The old building was remodeled and a substantially new building constructed costing from $8,000 to $15,000. The court said (p. 447): "It is insisted by appellants that under the covenant that any building on the premises, . . . should be a part of the realty . . . and be *in no case removed therefrom,* and be kept in repair, etc., the lessee was bound to keep and maintain the building just as she found it when the lease was made. In construing these covenants, as in the construction of every contract, the circumstances and conditions surrounding the parties and property must be taken into consideration. The manifest object of the parties in putting these covenants in the lease was to protect the lessor against loss resulting from

permitting the property to go into decay or to be removed from the premises. It can scarcely be seriously contended that it was expected that a building of the description of the one on the lots in 1874 should be maintained during the whole period of ninety-five years. In fact the evidence shows that at the time the improvements were made thereon they were necessary to prevent its becoming unsafe as a residence and falling into decay. That injury or danger of loss to the lessor was occasioned by the change is not pretended. More than double the security which the lessor had in the old building was furnished by the improvements made on it. There was no violation of the covenant in the lease by 'pulling down' or destroying or removing the house.''

In that case there was an express negative covenant in the lease prohibiting the removal of the building, while in the instant case the covenant is that the tenant ''in consideration . . . of this lease and as security for the payment of the rents . . . and the performance of the covenants,'' agreed that he would ''at all times during the continuance of this lease . . . keep and maintain upon said demised premises a building worth not less than Thirty-five Thousand Dollars ($35,000.)'' Obviously it was known that the old building would not last the 99 years mentioned in the lease and the value of the building to be kept on the premises as security for the payment of the rents was to be not less·than $35,000. And as said in the *Hawes* case, ''That injury or danger of loss to the lessor. was occasioned by the change is not pretended. More than double the security the lessor had in the old building was furnished by the improvements made on it.'' So, in the instant case, it is not pretended that the demolition of the old building and the construction of the new resulted in ''injury or danger of loss'' to the lessor, but on the contrary more than

four or five times the security the lessor had in the old building was furnished by the construction of the new on the premises.

The *Hawes* case was followed by our Supreme Court in the *Thompson* case, 336 Ill. 137, where it was held that a lessee of a long term lease may erect a new building in place of the old one on the premises; the court said (p. 149): "All interests in the Haskell property and income from it, will be unimpaired by the proposed construction of the building. . . . The improvement contributes to the income and adds greatly to the value of the *corpus* of the trust property. . . . There is no provision in the lease restricting the right of the lessee to erect a building of any size or of any cost or value or for any purpose. The right to occupy the land, under the terms of the lease, without restriction as to the character of building for the long period necessarily implies the right to replace the old with a new and better building so long, only, as the security of the lessor is not impaired. *Hawes v. Favor,* 161 Ill. 440.

"In the case just cited the lease contained covenants that the dwelling house on the lot should be held and taken as part and parcel of the realty and in no case to be removed therefrom. . . . There was also a covenant that the lessee should keep the premises in good repair during the term. Construing the negative covenants and denying their effect as a bar to the relief sought, (the construction of new buildings) it was said:" The court then quoted from the *Hawes* case and continuing said (p. 153): "Where a demise is made for a great number of years—say one hundred or two hundred—for a fair rental value of the premises, it must be presumed that the parties intended that the tenant for years should have well-nigh unrestricted use of the premises, provided he does not reduce their rental value, for in such case the reversion,

independent of the rent, is of mere nominal value. *Klie v. Von Broock,* 56 N. J. Eq. 18.

"No case in this State has been cited and no principle announced by any authoritative source that requires a lessee under a long-term lease to refrain from improving the subject of the lease until absolute necessity requires it. To forbid improvement is to require that the subject of the lease shall remain until it has fallen into a state of desuetude, and therefore to deny the right to devote the property to the highest and best use to which it may be suited. . . . It is not contended that security for the income of the ultimate beneficiaries is imperiled by the new building. It is manifest that it is not. The objections go only to the removal of the old building and the erection of a new building as provided for in the agreement. . . . No precaution for the protection of the beneficiaries has been omitted. Under the agreement Thompson is required, before demolishing the building, to furnish an undertaking, to be approved by the trustee, binding him and his personal and legal representatives and assigns within a reasonable time to erect and complete the new building."

In the instant case Mayer, before demolishing the old building, offered security to Collins by which there would be a guarantee to pay all rents and other claims and that a new building costing not less than $60,000 would be constructed and paid for, so that no precaution was omitted for the protection of Collins.

Counsel for defendant, Collins, in contending that Mayer had no right to demolish the old building and construct the new one, refer to *Chicago Auditorium Ass'n v. Cramer,* 8 F. (2d) 998, and *Willing v. Chicago Auditorium Ass'n,* 277 U. S. 274, which is the same case. In that case, suit was filed in the United States District Court by the lessee for the construction of long term leases to determine the lessee's right to remove a building from the premises incidental to the

erection of a new building of greater value, and it was held that the bill was not sustainable as a bill of peace. An appeal was taken to the United States Circuit Court of Appeals where the decree was reversed with directions to the District Court to hear the evidence and determine the issues involved. [20 F. (2d) 837.] The case was then taken to the United States Supreme Court where it was held that the proceeding was not a controversy within the meaning of Article III of the Constitution of the United States, "since no defendant had wronged or threatened to wrong the plaintiff and no cause of action arose from the threatening of plaintiff's plans by its own doubts or by the fears of others."

We hold that the principle announced in the *Hawes* and *Thompson* cases, *supra,* decided by the Supreme Court of this State, announces the correct rule of law applicable to the case at bar.

The decree of the superior court of Cook county is affirmed.

*Decree affirmed.*

McSurely and Matchett, JJ., concur.